USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __12/16/2014__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                               :
IN RE: TURQUOISE HILL RESOURCES LTD.    :
SECURITIES LITIGATION                           :         13 Civ. 8846 (LGS)
                                                               :
                                                               :           **OPINION AND**
                                                               :              **ORDER**
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

        This case is based on the allegation that Defendants "reported materially inflated revenue figures," causing the stock of Turquoise Hill Resources Ltd. ("Turquoise Hill") to trade at "artificially inflated prices." Lead Plaintiff Petr Nemec asserts his claims individually and on behalf of similarly situated shareholders of Turquoise Hill who purchased the company's common stock between March 28, 2011 and November 14, 2013, inclusive (the "Class Period"). The defendants are Turquoise Hill, and five individual defendants who are current and former officers of the company. The Consolidated and Amended Complaint (the "Complaint") contains two counts: (1) securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 and (2) controlling person liability based on section 20(a) of the Securities Exchange Act. Defendants move to dismiss the Complaint in its entirety. For the following reasons, their motion is granted.

## BACKGROUND

        The facts below are taken from the Complaint and assumed to be true for purposes of this motion. The Court also considers statements or documents incorporated into the Complaint by reference and legally required public disclosure documents filed with the Securities and

Exchange Commission.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**I.      Parties**

Known as Ivanhoe Mines Ltd. until August 2012, Defendant Turquoise Hill is a mineral exploration and development company headquartered in Vancouver, Canada.  It holds mineral resource properties around the world.  The common stock of Turquoise Hill is listed on the NYSE under the ticker symbol "TRQ."

Turquoise Hill owns a 57.6% interest in a company called SouthGobi Resources Ltd. ("SouthGobi") whose revenue recognition practices are at the center of this lawsuit.  SouthGobi operates a coal mine in Mongolia, is headquartered in Canada, and its stock is listed on the Toronto and Hong Kong stock exchanges.  SouthGobi, with its wholly-owned subsidiary SouthGobi Sands LLC ("Sands"), a company registered in Mongolia, owns and operates the Ovoot Tolgoi Project ("Ovoot"), a coal mine located in Mongolia.  The coal mine primarily sells to customers in China.  According to Defendants, SouthGobi issues its own audited financial statements.  Its financial results are also consolidated with those of Turquoise Hill, due to the latter's majority ownership.

In addition to Turquoise Hill, the Complaint names five individual defendants who served as officers of Turquoise Hill during the relevant period.  Defendant John Macken served as Turquoise Hill's Chief Executive Officer until October 2010 and as President until April 2012; he also served as SouthGobi's Chairman from June 2007 to October 2009 and as director until April 2012.  Defendant Robert Friedland served as Chief Executive Officer between October 2010 and April 2012.  Defendant Kay G. Priestly has served as Chief Executive Officer

since May 2012, as a director since February 2011, and as SouthGobi's Board Chairperson since September 2012.  Defendant Tony Giardini served as Turquoise Hill's Chief Financial Officer and Senior Vice President until April 2012.  Defendant Christopher Bateman has served as Turquoise Hill's Chief Financial Officer since May 2012.

## II.    Coal Mine Operations

Ovoot is a coal mine located approximately 40 kilometers from the Mongolia-China border.  In 2010 through 2013, SouthGobi sold its Ovoot coal primarily to two or three large China-based customers.  "During the fourth quarter of 2010, the full year 2011, and the first half of 2012, SouthGobi had structured certain of its contracts such that a customer's coal would be delivered to stockpiles in a stockyard located within Ovoot Tolgoi's mining license area [in Mongolia], the location specified in the contracts as the point of title transfer."  Customers were responsible for picking up the coal from the Ovoot stockyard.

Until the second half of 2012, revenue was recognized at the time of delivery in the stockyard, even though "the risk of loss stayed with SouthGobi until the customer physically transported the coal off the Ovoot Tolgoi Mine property."  The Complaint contains accounts from two confidential witnesses.  Confidential Witness No. 1 ("CW1") worked as a financial reporting advisor at SouthGobi from November 2012 to June 2013.  CW 1 stated that, during the Class Period, SouthGobi's "revenue was recognized based upon a constructive obligation on, and history of, the customer coming to the stockyard to pick up the coal," rather than "whether the customer actually picked up the coal at the stockyard."  CW 1 explained that, during periods where coal prices declined, customers became less inclined to pick up the coal that they had contracted to buy at a higher price.

Confidential Witness No. 2 ("CW2") was employed by Sands in Mongolia as a mining operations manager from May 2008 through March 2011. CW 2 stated that, due to difficulties with transportation at the China-Mongolia border, customers were often delayed in picking up coal. CW 2 also explained that "the risk of loss stayed with SouthGobi until the customer physically transported the coal off the [SouthGobi] property."

During the Class Period, SouthGobi faced myriad challenges operating in Mongolia. Transportation across the Mongolia-China border was troubled by infrastructural difficulties, particularly through the early portion of the Class Period. These transportation difficulties frequently delayed customers in picking up their coal at the stockyard. SouthGobi also faced other challenges, including volatility in the Chinese coal market and "ongoing investigations by the Mongolian authorities into corruption and tax evasion."

In the second half of 2012, SouthGobi conducted "a comprehensive strategic review of [its] business" and reviewed its revenue recognition policies. SouthGobi thereafter changed its revenue recognition practice, such that revenue would not be recognized until a customer collected the coal from the stockyard, instead of at the time the coal was delivered to the stockyard.

### III.   Press Releases, Annual Reports, and SEC Filings

The Complaint incorporates the text of press releases issued by Turquoise Hill from March 2011 through August 2013 as well as quarterly and annual reports filed with the SEC during that period. These documents announced Turquoise Hill's quarterly financial results and detailed, inter alia, (1) the role of SouthGobi as a significant part of Turquoise Hill's business, (2) SouthGobi's sales and revenue and (3) SouthGobi's contribution to Turquoise Hill's financial

results.

The Complaint also quotes certifications signed, pursuant to the Sarbanes-Oxley Act, by Defendants Friedland, Priestly, Giardini and Bateman.  These certifications state, inter alia, that (1) each individual Defendant reviewed Turquoise Hill's financial statements and (2) "[b]ased on [each person's] knowledge, having exercised reasonable diligence," the financial statements did not contain any misrepresentations.

The Complaint also quotes annual reports published by Turquoise Hill and SouthGobi during the Class Period.  One SouthGobi report is worth noting.  The Complaint alleges that SouthGobi's annual report for 2012 showed that "SouthGobi experienced a severe deterioration in its aging receivables."  Specifically, "SouthGobi's trade and other receivables totaled $17.4 million at December 31, 2012, but approximately 86% of that total ($15 million) was over six months old."

On November 8, 2013, Turquoise Hill issued a press release that announced it would "restat[e] its consolidated financial results for 2010, 2011, 2012 and the affected quarters, including 2013," following a decision by SouthGobi that "it plans to restate its financial results." The release further stated:

> The planned restatement is due to a change in SouthGobi's determination of when revenue should be recognized in accordance with International Financial Reporting Standards from its sales of coal previously recognized in fourth quarter of 2010, the full year 2011 and the first half of 2012.  The transactions in question involved sale contracts upon which revenue was recognized upon delivery to customers' stockpiles in a stockyard located within SouthGobi's Ovoot Tolgoi mine's mining license area.  Starting in the second half of 2012, SouthGobi adopted new terms in its sales contracts to provide for transfer of title upon loading the coal onto customers' trucks and revenue has been recognized at the time of customer collection in respect of sales under such contracts.

The same day, Turquoise Hill disclosed that it had received an SEC comment letter in March 2013 concerning Turquoise Hill's year-end financial statements for 2012, and asking about "'the appropriate accounting and disclosure under U.S. GAAP of the [SouthGobi coal] transactions.'" On November 11, 2013, Turquoise Hill further disclosed that its 2010 and 2011 revenues had been inflated by 32 and 36 percent, respectively.  On November 14, 2013, Turquoise Hill published its restated financial statements for 2011 and 2012, and disclosed that the improper revenue recognition was caused by a "material weakness in [Turquoise Hill]'s internal control . . ., resulting in the failure to properly account for revenues" -- specifically, that the company "did not ensure that all aspects of sales arrangements were considered in the determination of the appropriate accounting," resulting in the improper recognition of revenue "upon delivery to customers' stockpiles, rather than at the time of customer collection of the product."

**IV.   Claims**

The Complaint alleges that, during the Class Period, Defendants knew, but concealed from the public, that Turquoise Hill had (1) overstated its revenues in violation of Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"), (2) prematurely reported revenue, and (3) implemented deficient internal accounting controls.  The Complaint further alleges that Defendants failed to implement effective accounting controls and "knew and/or recklessly disregarded" that "the public documents and statements issued . . . were materially false and misleading."  "[W]hen Defendants' prior misrepresentations and omissions and fraudulent conduct were revealed, shares of Turquoise Hill stock declined -- evidence that the prior artificial inflation in the price of Turquoise Hill's shares was eradicated," causing shareholders to suffer economic losses.

**STANDARD**

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations. *See Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 284 (2d Cir. 2013). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Rule 8 of the Federal Rules of Civil Procedure "requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (alteration in original) (quoting *Twombly*, 550 U.S. at 555), *cert. denied*, 133 S. Ct. 846 (2013).

Where the alleged predicate acts are frauds, a plaintiff must "state with particularity the circumstances constituting fraud" pursuant to Federal Rule of Civil Procedure 9(b). Securities fraud claims also are subject to the "[e]xacting pleading requirements" of the Private Securities Litigation Reform Act of 1995, *Tellabs*, 551 U.S. at 313, which provides that a complaint must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A).

A critical element of a federal securities fraud claim is scienter. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted). The scienter requirement may be met by

alleging facts to show either "(1) that defendants had the motive and opportunity to commit fraud[] or (2) strong circumstantial evidence of conscious misbehavior or recklessness," but where motive is lacking, "the strength of the circumstantial allegations must be correspondingly greater . . . ." *Id.* at 198-99 (internal quotation marks omitted). The Second Circuit has observed that:

> [a]t least four circumstances may give rise to a strong inference of the requisite scienter: where the [C]omplaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Id.* at 199 (internal quotation marks omitted).

The Supreme Court has held that for an inference of the requisite scienter to be "strong" in accordance with § 78u-4(b)(2)(A), it must be "more than merely 'reasonable' or 'permissible' -- it must be cogent and . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. That inquiry cannot be conducted in a vacuum, but is "inherently comparative" -- i.e., "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. Thus, while the inference of scienter "need not be irrefutable . . . or even the most plausible of competing inferences," it must be "strong in light of other explanations." *Id.* at 324 (internal quotation marks omitted).

## **DISCUSSION**

### **I.    Section 10(b) Claim**

Plaintiff's claims under section 10(b) and Rule 10b-5 must be dismissed, as the

8

Complaint fails to plead requisite scienter by showing either "(1) that defendants had the motive and opportunity to commit fraud[] or (2) strong circumstantial evidence of conscious misbehavior or recklessness," *ECA*, 553 F.3d at 198-99.

### A. Motive and Opportunity

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [Defendants] 'benefitted in some concrete and personal way from the fraud.'" *Id.* at 198 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Here, the Complaint alleges that Defendants made misstatements "for the purpose and effect of concealing Turquoise Hill's true financial results and internal controls from the investing public and supporting the artificially inflated price of its common stock." Neither this allegation nor any of the other paragraphs of the Complaint describe a sufficient motive on the part of Defendants. A corporate officer's general desire to maintain a high stock price does not satisfy the motive requirement. *Id.* ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *see also Novak*, 216 F.3d at 308 (allegations that corporate insiders sought to "maintain a high stock price . . . to increase executive compensation" do not show motive, but allegations that corporate insiders kept "stock price artificially high while they sold their own shares at a profit" do). Also, Plaintiff's argument seems to rely exclusively on the alternative means of showing scienter and does not contend that the Complaint alleges "motive and opportunity" to defraud.

### B. Conscious Misbehavior or Recklessness

A plaintiff may raise a strong inference of scienter through circumstantial evidence of

9

conscious misbehavior or recklessness, but "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). As the circumstantial evidence alleged in the Complaint falls well short of this standard, Plaintiff's section 10(b) claim also fails under the "conscious misbehavior or reckless" theory.

Plaintiff argues that the Complaint alleges several facts that, taken together, support an inference of scienter. None of these facts, considered individually or together, are sufficient to plead scienter concerning the alleged misapplication of accounting principles at SouthGobi, a Turquoise Hill subsidiary. With the exception of Macken (who served as a SouthGobi director) and Priestly (who serves as SouthGobi's Chairperson), the Complaint does not allege that Defendants are employed by or occupy any board positions at SouthGobi during the Class Period. Furthermore, a parent company's reliance on a subsidiary's audited financial statements is not necessarily unreasonable. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271 (2d Cir. 1996) (agreeing that "[i]ntentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls") (quoting *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594, 1996 WL 88570, at *15 (S.D.N.Y. Feb. 29, 1996)). Indeed, the Complaint does not allege that Turquoise Hill's auditors disapproved of SouthGobi's accounting practices or found any lack of internal controls prior to the restatement. *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) ("It is noteworthy that [the] outside auditor[s] did not question [the corporate defendant's] accounting practices.") (citing *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003)). In short, although a restatement inherently acknowledges an error in a company's financial statements, the Complaint's allegations do not support an inference that this error was intentional or that

Defendants furthered the error, condoned it or were even aware of it until steps to review and ultimately correct it began.

Plaintiff's arguments to the contrary are unavailing. First, Plaintiff asserts that the relevant accounting principles here are "simply stated and . . . straightforward" and that, "where GAAP and its application are basic, courts have found an inference of scienter." Generally, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. Here, the Complaint does not support the conclusion that application of the relevant revenue recognition accounting principles was necessarily obvious or straightforward.

Second, Plaintiff argues that the Complaint alleges facts concerning individual Defendants sufficient to support an inference of scienter. In particular, the Complaint alleges that (a) individual Defendants' periodic review of Turquoise Hill's consolidated financial statements "gave them knowledge and/or access to information" about SouthGobi's revenue recognition practices, (b) individual Defendants would have been "necessarily involve[d]" in Turquoise Hill's response to the SEC's March 2013 comment letter and (c) Defendant Priestly -- who was Turquoise Hill's CEO and SouthGobi's Chairman, an accountant -- was a part of the "new management" that conducted the 2012 strategic review that led to the revision of SouthGobi's revenue recognition policies. These allegations do not satisfy the stringent particularity requirement imposed by Federal Rule of Civil Rule 9(b). *See Aetna Cas. And Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 579 (2d Cir. 2005); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Rather, except as to Priestly, they are conclusory "accusations founded on nothing more than [defendants'] corporate position[s]" and "are entitled

11

to no weight." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010). As to Defendant Priestly, the allegations as readily lead to the conclusion that she was part of an effort to investigate and correct the financial statements rather than mislead.

Similarly unavailing is Plaintiff's reliance on allegations of individual Defendants' Sarbanes-Oxley certifications. Plaintiff has not "offer[ed] any particularized allegation of an inference that . . . the related CEO and CFO certifications pursuant to the Sarbanes-Oxley Act were not honestly and reasonably believed to be true when made." *Bausch & Lomb*, 592 F. Supp. 2d at 341; *accord Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) ("[A] Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.")

Nor are the allegations of confidential witness accounts sufficient to plead scienter. The Complaint does not allege that either confidential witness had any contact with the individual Defendants, or even any Turquoise Hill employee. None of the allegations about the confidential witnesses are tied to, or have any bearing on, any individual Defendant or his or her state of mind.

Third, Plaintiff contends that SouthGobi's "high level of aging receivables" alleged in the Complaint was a red flag that Defendants consciously or recklessly disregarded. However, the Complaint does not allege that the Defendants at Turquoise Hill had any reason or responsibility to be aware of the level of receivables at the subsidiary. In addition, while the Complaint alleges that, at the end of 2012, approximately 86 percent of SouthGobi's receivables were more than six months old, the significance of the receivables is inconclusive, as SouthGobi had already

12

conducted its comprehensive review, revised its contracts and changed or was in the process of changing its revenue recognition policy.

Fourth, Plaintiff describes the magnitude of Turquoise Hill's restatement as "substantial," in order to create an inference of scienter. Although "the magnitude [of a restatement] can be relevant to the scienter inquiry . . . it is clear that the size of the fraud alone does not create an inference of scienter." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 250-51 (S.D.N.Y. 2012) (internal quotation marks and emphasis omitted). The magnitude of a restatement, in other words, must be presented in tandem with other circumstantial evidence to suggest scienter. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (considering magnitude of write-off, in conjunction with poor sales, to discredit inference suggested by defendants); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (considering magnitude of special charges listed by defendant in financial statements, in conjunction with misrepresentations about sales, as suggestive of scienter). A restatement is simply a correction, after the fact, of an accounting or other error in financial results. The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment and made initially in the audited financial statements of a subsidiary. Plaintiff relies on the magnitude of the restatement unsupported by other factors that would lead to an inference of scienter.

Fifth, Plaintiff asserts that Turquoise Hill's "materially weak" accounting controls suggest scienter. However, the weak accounting controls with regard to revenue recognition are not alleged to have been flagged by the auditors or brought to the attention of Defendants until after the allegedly false and misleading financial statements were issued and in conjunction with

13

the restatement. The accounting controls were an after-the-fact explanation for why the error had occurred, not a red flag before it was discovered. Plaintiff cites no legal authorities that allegations of deficient accounting controls alone (without any connection to a particular defendant), sufficiently plead scienter. *See Chill*, 101 F.3d at 270-71 (reasoning that "intentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls" (alteration omitted)). The weakness of the controls, then, is insufficient to allege scienter.

Sixth and finally, Plaintiff argues that Defendants identified SouthGobi as one of Turquoise Hill's "three core businesses," which permits an inference of scienter under the "core operations doctrine." Courts in this Circuit have observed, "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA." *Hensley v. IEC Elecs. Corp.*, No. 13 Civ. 4507 JMF, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014); *accord Frederick v. Mechel OAO*, 475 F. App'x 353, 356-57 (2d Cir. 2012). The parties dispute whether SouthGobi should be considered a "core business" here. In any event, resolving this issue is unnecessary because "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, [but] they cannot establish scienter independently." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011); *accord In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

A holistic view of the Complaint, including the alleged role of SouthGobi in the operations of Turquoise Hill, does not support an inference of scienter. Accordingly, Plaintiff's section 10(b) claim must be dismissed.

**II.     Section 20(a)**

As Plaintiff's section 10(b) claim is dismissed, Plaintiff's section 20(a) claim against individual Defendants necessarily fails.

"In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted).  Thus, "[a] plaintiff must first plead facts showing a primary violation of the securities laws by the allegedly controlled person." *In re Alstom SA*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005); *accord Brown v. Hutton Grp.*, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party.").

As Plaintiff has failed to state a claim for a primary violation of securities law, Plaintiff's section 20(a) claim must be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety.

The Clerk is directed to close the motion at Docket No. 47.

SO ORDERED.

Dated: December 16, 2014
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**